Good morning Your Honors, Susan Alexander of Milberg Weiss for the Point of Class of 2016. I'm going to start with a very simple example of the kind of thing that happened between the time that the district court upheld the complaint in its entirety and the time that the district court entered final summary judgment against plaintiffs. Plaintiffs proffered discovery, defendants stonewalled and ultimately produced 42 pages of discovery, amounting to 42 what? 42 pages of discovery. Those are boxes of discovery. Well, other than the 42 pages, they were all public documents that had either been previously attached to the complaint or were available in other public documents. The 42 pages amounted to the script of Defendant Johnston's intended remarks at the March 4th Merrill Lynch Conference and some slides that he planned to present. What's significant is what didn't happen. There are four things that did not happen. The first is defendants did not even produce the documents that they themselves had identified as being relevant to the limited issues that they understood as being upheld by the district court. Now, the only issue, the only questioned issue in this case, is it not, is whether or not Johnston and Rose actually made the false statements you allege they made in March and April, respectively. Can you point to specific documents in Clorox's possession that they have not yet produced? Absolutely. And they pointed to them themselves. There's a point, and I want to answer your question and also clarify something. To answer your question, the place where they identified those documents themselves is at page 560 of the excerpts of record. That's their 26A disclosure, where they identified calendars and agendas of meetings between Clorox defendants and analysts in the spring of 1999. And now, if I may, there are more documents, but I want to clarify something. Throughout defendants' briefs, they've put quotation marks around this particular phrase as though the question is whether defendant Johnston or defendant Rose used those particular words. And I want to clarify that that's not what we alleged. If you look at paragraph 93 of the complaint, which is in the excerpts of record at pages 68 and 69, you'll see that that's the paragraph that alleges false statements in March of 1999 by defendant Johnston at the Merrill Lynch Conference. And if you turn the page, there are bullet points of categories of false statements. One of the categories of false statements, so we're at 69 of the record, one of the categories of false statements is this, the concept that the defendants had, that the first brands inventory problem was quantified and it was a temporary and transitory problem. It does not allege that defendant Johnston used those exact words. And paragraph 104, which is in the excerpts of record at pages 73 and 74, I'm sorry, I make similar allegations about what defendant Rose said in the April 22nd conference call and what defendant Rose and defendant Johnston said in follow-up conversations with analysts. Again, the language describes a category of false statements where they're saying this is a temporary and transitory problem, despite the fact that Mr. Musica, an 18-year employee and manager of Clorox, is telling us that internally this situation is at panic levels and they're getting more and more bad news every day. Let me ask you a clarifying question. Yes. Are you arguing that, let's just take the Rose transcript, we know what was said in that class. Exactly. Yes, Your Honor. Are you arguing that when you read that transcript, one gets necessarily, gets the impression that she was saying that problem was transitory and temporary? Yes. Is that your argument? Yes, we are. Despite the fact she didn't use those words, you're arguing that when you listen to her words, you necessarily conclude that that's what she was intending to convey? That's exactly it, Your Honor. All right. Thank you. And, in fact, the district court agreed with that and said that her comments were not quite consistent with the internal knowledge based on Mr. Musica's declaration. If you look at paragraph 14 of Mr. Musica's declaration, it says just about every day more adverse information was learned about the magnitude and extent of the inventory problem. And so saying that it was quantified, you're exactly right, Your Honor, that's what we're talking about. Ms. Alexander. Yes. I know there's been a lot of my certifications have made it very tough to get 10b-5 claims approved at the beginning. Is there some difference between a company making a statement of an existing situation and a statement that really is looking toward the future and even the term transitory and existing, but it also is saying, well, this is what will happen in the future? And isn't that more protected than really making an outright fib or lie? Your Honor, it is true that forward-looking statements are more protected, but the district court misapplied. There's several errors of law with the safe harbor ruling here. And so the district court looked at this statement and said that what she said was not quite consistent with existing knowledge. And then he looked at the cautions that she gave. There's one sentence in the conference call, and then she refers to the 10k, which contains two sentences. So we're talking about three sentences altogether. And he looked at them, and let me give you his words. He said that the latter caution, this is at ER-598, the latter caution does not specifically relate to the inventory problem. And he said that the former statements are quite general. And nonetheless, he said there's no liability because, this is at 598 also, because she spoke only a couple of sentences and provided an approximate timetable. Your Honor, it is not the law of this circuit that one may speak a couple of sentences and that are knowingly false and be protected under the safe harbor. Knowingly false is what bothers me in the sense that when you're looking toward the future, I suppose you're entitled to take an optimistic view rather than a pessimistic one. It's like, is a glass half full or half empty? Yes, but the knowledge, but the statement has to be informed with the truth of what you know at the time. And that's why the district court. You're saying that they knew better. That they knew they were, it was a bigger problem than they were willing to disclose to the public. Absolutely, Your Honor. There were panic levels, and they were saying this is a temporary transitory problem. And this circuit's decisions in Hannon and Apple both say that it is fraud to say that a, to describe a future problem when you, a future situation as not being a problem when you know of current problems. I'd like to go back, if I may, to the three other things that did not happen between the time that the complaint was upheld in its entirety and final summary judgment was entered. The first, which we already talked about, is that defendants did not even produce the documents that they themselves had identified as being relevant to the claim in the limited fashion that they saw the claim as being upheld. The second thing that did not happen is defendants refused to meet and confer. Just refused. The third thing that didn't happen is there was never any court hearing to clarify some modified scope of the complaint. And the fourth thing that never happened is the district court. Was there to clarify. Well, the district court upheld the entire complaint. And in our. For example, Your Honor, in the, in the order upholding the complaint, the district court talked about a set of statements made in the spring, both by defendants and via analysts. That's at ER 149. And then we get to the summary judgment order. And all of a sudden we're just talking about the statements by defendants. There was a phantom dismissal of the analyst statements, which appeared to have been prior to the date set for the hearing on the motion to dismiss the third amended complaint. We filed a separate motion in writing requesting that we have a hearing so that these issues could be discussed. And there was never any hearing in the district court. The fourth thing that didn't happen is the district court didn't rule on a pending motion to compel to resolve discovery disputes. Well. Before entering final summary judgment. The question there would be whether, whether the requests were necessary to avoid summary judgment or to avoid dismissal. Well, let me, let me if I may then identify, because it's important that there are two sets of discovery. There's the set of discovery that we propounded after our complaint was upheld in its entirety. Let me, let me tell you what my concern is so that you can, you can straighten me out from your point of view. Great. It looks to me as if you elected, basically, to go for the whole enchilada and ask for discovery with respect to the entire complaint, including Scienter, including information that was known across the board, whereas the motion is focused solely on whether the statements were, in fact, made. It doesn't. So, so that's the way I, that's the impression I get from reading the record. I understand that. And I, and I think it's an important clarification. There's one set of discovery which is, in Your Honor's words, the whole enchilada that we propounded after the complaint was upheld. There is a much more narrowly tailored set of discovery that was identified in our 56F motion that relates specifically to the issues raised on summary judgment. There are three categories of them. The Merrill Lynch analyst report raises a factual question as to what Mr. Johnson said, because it contains material not in his script. That's one. Number two, there are five analyst reports that contain, that raise the possibility of meaningful discovery. Which we have. I mean, we have the reports. And so one can look at them and see what those reports are. And when I read them, I don't see that they attribute anything to Johnson. And some of them weren't even present at the conference. Well, that's the Merrill Lynch. The one that was present at the conference doesn't say anything attributable to Johnson, does it? The Merrill Lynch? Yeah. Well, we know that Merrill Lynch people were at the Merrill Lynch conference. Well, I may have the reports, you know, slightly. It's hard for me to keep track of everything. Of course, of course. Well, the Merrill Lynch one, then there was a Morgan Stanley report and a Payne Weber report. There may have been a couple of others. Let me talk about the Payne Weber report for a minute. There's a Payne Weber report that's at ER 422 to 423 that says, after recently meeting with the management of Clorox. We believe. We believe that. Yes. After meeting with Clorox. Yes. But you can't read that paragraph, I think, and interpret it any other way than as a statement of what Merrill Lynch believes. Based on information that they're getting from management. Well, sure, but you can't. I mean, Merrill Lynch may believe that the problem was temporary and transitory, but why does that shed any light on what else might have been said? If it were by itself, I would understand your concern. Okay. But there are so many analyst reports that say sales and earnings growth are going to be limited for three quarters. We're going to fix the problems in a process. It estimates, that's the Payne Weber report from April 23rd, Clorox will fix the problems in a process, quote, it estimates, will take one year. Short-term phenomenon that will take three quarters to work out. Credit Swiss versus Boston report says likely to constrain growth over the next few quarters. And what we're looking at here is not even whether we can raise a tribal issue of fact. We're looking at whether these reports create the possibility of meaningful further discovery. Do these reports suggest that we ought to be able to get the documents and then we ought to be able to complete document discovery and take some depositions? Well, I ought to respond to one other thing that was argued, and that is that there was five months, if I recall correctly, between the time that you had third-party subpoenas and the time that the summary judgment motion was actually resolved. Well. During which to pursue it. Right. And we have pursued it. We've been completely stonewalled by defendants with requests for extension after extension. That would be third-party subpoenas, too, I assume the program has. Your Honor, we've propounded both. We've propounded discovery to defendants as well as third-party discovery. And we're in the process of meeting, or we were in the process of meeting and conferring with several of the third-party, third parties. And when we complete all of the discovery, then we want to take the depositions. And I would like to point out, excuse me, the district court did not deny the 56F application because it found any sort of delay or any sort of lack of diligence. And if you look at the cases that defendants cite, as I think we've made clear in the briefs, they're much more extreme examples than a question of whether it was too many months before we noticed depositions. Your Honor, if I may, I'd like to reserve the rest of my time for rebuttal. Thank you. Good morning. May it please the Court. My name is Jordan F., counsel for defendants. Three years after being sued for securities fraud and six months after the district court's order on the third consolidated amended complaint, Clorox filed a simple threshold motion for summary judgment. It raised a very straightforward issue. Did Gerald Johnston on March 3, 1999, and did Karen Rose on April 22, 1999, state that Clorox, that the first brand's inventory issue was temporary, transitory, and not reflective of serious problems? It was a threshold, simple issue. Now, the court asked earlier, what about the boxes that were produced? There were 50-plus boxes in response to the 20-plus subpoenas that plaintiffs had served. So they did have 50-plus boxes. They had documents from analysts. What about the production by Clorox? Clorox produced in total several hundred pages. Well, why wasn't it thousands of pages? Because it was a simple threshold issue. What about in our disclosures when we said we may rely in our defense on other documents? We had mentioned calendars. Well, that would be on all elements of the claim. We were moving on a very simple point. It's the most simple. You asked about the failure to meet and confer. Yes. What is your comment on that? That's incorrect. There's no surprise whatsoever in this case from the start in our answer, in our objections to discovery, in conversations with the plaintiffs, in our objections to third-party discovery, in our initial disclosures, we made crystal clear ahead of time exactly what our position was. It was that there were two statements at issue, discovery. We were going to move for partial summary judgment on the two statements and that we were going to move for judgment on the pleadings as to the rest of it. It's in written documents and it was in oral communications. Plaintiffs paint this as if there's a discovery dispute. The dispute wasn't about discovery. The dispute is how do you respond to a summary judgment motion? It's really a dispute about 56-F. The court said that plaintiffs wanted the whole enchilada. They wanted the whole restaurant. They wanted everything. I mean, what did they ask for in the brief opposing summary judgment? They didn't say we need another month to depose Merrill Lynch and to depose the declarants. They didn't say that at all. What they said is we need to have our opposition brief continued, the due date continued, until 45 days after the end of all discovery. And that would be another year or two. How many depositions did your opponents take? They took a grand total of zero. No depositions. They took zero depositions. Well, maybe that's a plus if discovery had not been completed. Well, Your Honor, what they talk about in their briefs is they should have been permitted to take depositions. They were permitted to take depositions. They didn't depose. They knew about the analyst reports, of course. Absolutely. They did not seek to depose the analyst. They did not seek to depose a declarant. They did not seek to depose Rose or Johnston or any Clorox employee. And to prepare a deposition notice takes about five minutes, maybe ten, to serve it another day. And why didn't they do it? They tell us exactly why. They say it was to be efficient, that it would be more efficient and more courteous to the parties and to counsel. Not courteous. They say considerate, that the efficient and considerate way to do it would be for them to get what we always see in these cases, what we always bemoan in these cases, truckloads of documents, e-mail backups. They say in their papers the heart of this case is falsity and scienter. We had a threshold issue. Summary judgment exists so that we don't have to go through all that, so that defendants who have been under a cloud for years can now have it listed if there's a threshold issue. So what your position is basically is, look, there's two statements that are attributable through the analyst to Clorox's leadership. And we provided what we had. And if they – and there's no sense in bringing them truckloads. That wasn't the issue. That's your point. And they did not subpoena the people who made the reports where they could have found out directly what did Johnson and Rhodes or wherever it was say. That's your point. That's correct. Actually, they initially subpoenaed all the analysts back in April with a return date of May. Their summary judgment opposition, they asked for more time. We agreed to it. We gave them an extra few weeks. The hearing was kicked back. Months and months went by. And what we see in their affidavit is that they were in the process of meeting and conferring. Okay. Whatever that means. You answered my question. Yes. Thank you. Thank you. So they can only obtain a continuance if they say, here's the essential fact. Here's the essential fact that we need to oppose summary judgment. Not here are all these other things on other issues that we'd like to have. Of course, they'd like to have it. They'd like to have that discovery burden imposed on us. But what is it that was essential to the summary judgment? Their motion to compel that we heard about? Their motion to compel said, Defendants are required to produce relevant documents responsive to each request, not just the requests related to the summary judgment motion. That fundamentally misunderstands the whole purpose of summary judgment. The idea of saying, okay, we see you're pleading. Now we want to test it. Now we want to test it. It's for the efficiency of the courts. It's for the efficiency of litigation in general. We have an opportunity to test that. Now, plaintiffs also argue that they did identify meaningful discovery. We heard a little bit about that this morning. We heard about a Payne-Weber report. We heard about, in the papers, we hear about other reports. Payne-Weber report had nothing to do with our motion for summary judgment. The Payne-Weber report had to do with a different meeting. If a meeting ever existed, it was not the March 4th, excuse me, March 3rd Merrill Lynch conference. It was not the April 22nd conference call. If there had been a meeting, it was something else, something that was not upheld by the court as meeting the Reform Act standards, something we weren't moving for summary judgment on. So it wouldn't justify any continuance. Plaintiffs also argue in their papers that restricting the case to the two statements was too narrow, that they didn't have a hearing in front of the judge. How could they figure it out? Well, it's crystal clear in the order. The judge does exactly what the Reform Act requires. Judge Conte identified date, speaker, content, paragraph number, and complaint. And if the Reform Act means anything, it's that you have to do that. It's a fraud case, after all. What are you accusing us of saying? And the court did that with great precision. In any event, we moved for summary judgment on those statements, so we framed the issue, if there was any doubt about it at all. So that plaintiffs can't now say this was they say it was a phantom dismissal. The court said these are the only two statements that meet the Reform Act requirements. No other statements do that. Now, plaintiffs this morning echoed something from their papers when they said, well, there could have been more discovery from Merrill Lynch, because it was the Merrill Lynch report on March 4th, the Merrill Lynch report after the March 3rd conference that plaintiffs point to. Well, besides the fact that they had months and months and months to get it, there's no reason to think that that report contains anything essential to opposing summary judgment. The only thing they point to is a statement that says that Clorox said it would be 18 months, 18 months before the effects of First Brand's inventory practices would be eradicated. Well, that's exactly what plaintiffs claim Clorox concealed from the market. If anything, it would completely undermine their case. So there's nothing in that report that would lead anyone to believe that they could find any documents or any additional information that would be helpful to their cause in opposing summary judgment. Why don't just turn to the Burlington Northern case. Plaintiffs take us to task for not citing it in our brief. Plaintiffs didn't cite it in their opening brief, so it was only in their reply brief that it first comes up. And Burlington Northern actually shows the great contrast between where you can get a continuance and where you can't under 56F. Burlington Northern, a railroad company, sued an Indian tribe, and a month after filing suit, less than a month, in what the Ninth Circuit said was lightning-quick fashion, filed a motion for summary judgment. Zero discovery had taken place. And the factual issue in that case is what was Burlington Northern carrying in its trains? That was the issue. Is it dangerous? Is it hazardous? What was it carrying in its trains? The Ninth Circuit said, well, how can the Indian tribe know what Burlington Northern is carrying in its trains without discovery? Here we have the exact opposite situation. We have a lawsuit brought under the statute that has the strictest pleading requirements. The accusation is that we made public misrepresentations, not secret, not secret misrepresentations. If they had been private or secret misrepresentations, there would be no case at all, because it couldn't have affected the market. And instead of being a lightning-quick summary judgment motion, this was three years after they filed suit, six months after the Court ruled on the motion to dismiss, where we had told them repeatedly in papers and in oral conversations exactly what was coming. Plaintiffs had agreed, getting back to the meet and confer point, we won't meet ñ we'll agree with you not to meet and confer until after you file your motion for partial summary judgment and judgment on the pleadings. They sent us a letter about that. We said we're available on September 4, and there's a lot in the record about this. They called. They weren't available. They talked. September 13, we said where we are on this is you get what we have on the issues we've raised by summary judgment. They didn't want that. They didn't want that. I would just like to turn briefly in my time ñ I still have some time left, I see ñ to the merits of the summary judgment and briefly to judgment on the pleadings. On the summary judgment itself, plaintiffs presented no admissible evidence whatsoever. What they presented were two declarations, one from the lead plaintiff, who had no knowledge of what statements were being made. It again shows a misapprehension of what the issue was on our summary judgment motion. It was all about other things, and we heard a little bit about it today, panic levels and so forth. But it had nothing to do with whether Gerald Johnston and Karen Rose made those statements. The other declaration was from an attorney, and it attached analyst reports. Are those analyst reports admissible as evidence of what we said? There's a Ninth Circuit case that's directly on point. It's the Larez case. It involved a civil rights lawsuit against Daryl Gates. Daryl Gates made a statement to newspaper reporters at trial. The judge allowed the newspaper stories into evidence, reversed abuse of discretion to allow that inadmissible hearsay. Larez has been followed by numerous district courts in the Ninth Circuit, Syrris and Cypress and some others. In this precise situation, the exact situation we have here, plaintiffs don't say a word about those cases. The Seventh Circuit has applied the exact reasoning of Larez, doesn't cite Larez, the exact same reason for the exact situation here, admissibility of analyst reports. Plaintiffs don't say anything about that. What they do is they cite some criminal co-conspirator cases that don't address this situation. And then they try to distinguish Larez. And what they say is that the error in Larez is that the trial court's refusal to allow testimony from the reporters was the error, that they should have the trial court, that was the error. The error was in admitting hearsay evidence. We had objected below. We had objected to the analyst reports. The court never ruled on that. And it was inadmissible, and it's an abuse of discretion to allow in inadmissible hearsay evidence. Now, what Judge Conte did, he didn't find the precise statement, transitory or temporary. He found a different statement. It was the answer to the last question in the April 22nd conference call, where Karen Rose said that clearing out the inventory would involve a slow bleed and would be a year-long process approximately. Plaintiffs now argue that that statement was in their complaint. And we heard this morning, well, it's somehow subsumed within there and between the lines or in the interstices, or you can interpret it that way. Plaintiffs had the transcript that contained that statement since July 2000, because we had attached it to our motion to dismiss the very first amended complaint. And they're not shy about making allegations. And they never once included anything from there. The paragraph they referred to does not contain, paragraph 105 does not contain the statement. The Reform Act has standards that say you've got to tell us what you're accusing us of saying. What exactly? Not we'll get to it eventually. It's something like this. So the statement wasn't in there, and under Kaplan v. Rose, you can stop right there. Statement not in the complaint, and that can be the end of it. But even if the statement does come in, we still have the safe harbor and we still have the Disputes Caution Doctrine. And there's no dispute, as Judge Bright alluded to, this is a forward-looking statement. The statement, it will be a slow bleed and would be a year-long process approximately in answer to a question at a conference call. Was the key, the word approximately, to make it? Excuse me? Was the key in that statement approximately? That certainly helps, Your Honor, yes. I would, I think you're getting to it. I wanted you to comment on the adequacy of the warnings. Yes. There are two different doctrines. One is the safe harbor. One is Disputes Caution. The first thing you do is you look at the statement. And the Ninth Circuit is consistent in saying you have to look at the context. And if the statement is, we guarantee it will be 12 months, that's very different from slow bleed, year-long process approximately. On its face, that's not an exuberant, optimistic prediction. That is a cautious statement by itself. But at the beginning of the conference call, what Karen Rose did is she said, we're going to be making statements that are forward-looking under the Reform Act, or however she referred to it. Take a look at our 10-K filed such-and-such date, specific document. There's a paragraph in there. We've heard it's only a few sentences. There's a paragraph on mergers. Clorox had a policy, a business plan of making mergers, people in the market knew of acquiring companies and transforming them into Clorox's business model. And what does the paragraph say? We can't assure that these will work out, that they'll be profitable, that they'll justify the investment and so forth. So you take a statement that on its face is cautious, you combine it with a reference to a 10-K, and under the safe harbor and under the policies of the Reform Act, even if it would come in, it would be protected. But then we go to the second doctrine, bespeeched caution. Under the bespeeched caution doctrine, and there's a circuit case on this, the Grossman v. Nivelle case from the Tenth Circuit, you can look at not only the statement specifically referred to, the caution specifically referred to, but other cautions in weighty documents, I think is the phrase the Court uses, such as SEC filings. Well, there was a registration statement in connection with the merger. That statement contained numerous cautions about mergers, as did Clorox's 10-Q, filed in February. So we don't think the statement should come in. It wasn't ever in a complaint. But if it does come in, the combination of the statement's caution on its face, plus the cautions in the 10-K, Ms. Rose did exactly what Congress said she had to do, refer to a document that contains cautions. That's the way you get the protection that Congress meant to give you in the Reform Act, plus the cautions repeated in other SEC filings would protect that statement. And we heard, well, it was knowingly false, and the Court found it was knowingly false. The Court made no such finding, of course. The Court said, well, I can look at this statement. I can find that it's knowingly false. And the cautions come in regardless of knowledge. It's a completely separate issue. Does that address your point? It does, though the cautions are sort of boilerplate language, are they not? Well, Your Honor, I would contrast the cautions here with the cautions that plaintiffs cite in the district court case of Apple Computer. The district court case where the sole caution was, was the trends may not, you know, the trends may actual trends could differ materially from our forecast. That was the sole caution. The Apple case was a product defect case. Actual trends could differ. Our case involves the merger of two companies and the risks that can be faced when you have to integrate two different ways of doing business. There were paragraphs on merger acquisition risk. Not, you know, past performance is no guarantee of the future. Not that kind of. You've answered the question. Thank you. Thank you. Finally, in my 35 seconds, on judgment on the pleadings, the issue is very straightforward. The statement wasn't that the acquisition would be immediately accretive. It was immediately accretive to earnings before charges. Earnings before charges. There was no admission ever that it hadn't been immediately accretive. The only admission is there was an initial sales decline under Urish and under Readwright, under both those cases. There's no match between the alleged admission and the alleged misleading statement. Mr. S., I want to make a comment, which you may respond to. I've probably sat in a thousand arguments. This is the first time I've ever had an attorney before me wearing what appears to be the same necktie as I have. I don't know how that came about. Well, Your Honor, I was going to compliment you on the way you were dressed, but I thought it would be unseemly. At least you're not tied up in knots. All right. Ms. Alexander. Your Honor, I'd like to go back to an important point related to the 56th motion. This is not a case about two sentences and a question of whether or not two particular sentences with particular exact words were made. We know the complaint alleged false statements by Defendant Johnston at the March 4th analyst, Merrill Lynch Analyst Conference, and the complaint alleges false statements by Rose in the April 22nd conference call. The complaint also alleges follow-up discussions between Johnston and Rose on both those dates, and the district court upheld a set of statements, and the district court went further. The district court said that it was clear, there was no question that there were follow-up conversations that both Rose and Johnston held follow-up conversations with analysts. And nonetheless, and Rose in her declaration admits having follow-up conversations, but the district court said there's still no question of fact about what was said, and beyond that, no need for further discovery because, and this is at page 599 of the excerpts of record, because, quote, both claim to have said nothing different. Close quote. Because the defendants say they didn't say anything different. Well, already, even at this early stage of the discovery, there are analyst reports that create the possibility that that's just not the case. There are analyst reports that suggest that defendants were quantifying the first brand's inventory problem as having been contained as a problem that was temporary and transitory, and that the inventory problem was being described in a very different way than the way it was being discussed internally in terms of panic levels and in terms of bad news that was growing every day. That's the discovery that we should have gotten. I also would like to address the cautions, Judge Nelson, that you were discussing. Yes. There is one sentence at the end of Ms. Rose's conference call that contains the word approximately. It's the seventh time in the conference call that she quantified the first brand's inventory problem. It's not the only statement that was made. There were seven different statements. And we've attached the text of what she said to the back of the reply brief so that you can go through it yourself. We laid out each of the statements in the opening brief. And what Judge Bright, what the court in Helwig, the Sixth Circuit said in Helwig, is that where you have those forward-looking statements and you're going to rely on cautions to avoid liability for being false, they can't be boilerplate, they have to convey substantial information about factors that realistically could cause results to materially differ. Unless the court has further questions, I think. I don't think so. Thank you, Ms. Alexander. I'd like to thank both counsel for very fine and helpful arguments in this matter. And the matter just argued will be submitted. We're going to take a brief recess before hearing the last matter on calendar. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Yeah, I've got to ask you a question. Yeah, go for it. So, how often do you see each other? I guess it's very simple. Every Monday morning at 11 o'clock and Sunday at 3 o'clock. Yeah, I see. I'm like, oh, that's not too long. It's not too long. Yeah. I'm like, oh, that's not too long. Yeah, because we see each other every week. Yeah. It's really special. I like that. I'm not sure if I saw you over here last week. Yeah, I didn't see you. Sorry. Yeah. What happened to you? I'm sorry, what happened to you? I don't know if anything else has happened to you, but it looks like you're getting high on drugs or something. I'm pretty sure it says that on the side of your mouth. Yeah, it does. So, I guess it looks like you've been having a really hard time. Oh, I don't plan on being long at all, to be honest. Yeah. Did you come in this morning for her? No, we came in last night. What about you? I did the same thing. So, I don't know if it matters. I don't know. I don't know. I'm recording here. Get up here. It's almost impossible. So, it's really weird. Oh, I think so. And that's why I don't know why Chris is... I mean, you know, there's one thing to go after somebody. It's another thing to collect. Sure. Right. Yeah. Right. Yeah, exactly. Right. Right. Yeah, that's all. Call them here. It's very nice. It's very nice. Okay, let's go. Right. Right. Right. Okay.  Right. Right. Okay.  Yep. Right. Okay. Right. Okay. Okay.  Mm-hmm. Okay. Okay. Okay. Okay. Okay. Okay. Stop. Stop. Stop. Stop. Okay. Okay. Stop. Stop.  Stop. Okay. Stop. Stop. Stop. Stop. Stop. Stop. This is not right. Judge Reimer is presiding. This is Judge Nelson. This is Judge Bright. What now? Who's in the middle? Who's in the middle? Judge Reimer is presiding. Okay. Bright's over here. Do you have the sheriff's department? No. Yes. Thank you. Oh. Thank you. Thank you. All right. Thank you.   Thank you. Thank you. Thank you. Yes. You did. Thank you.   Thank you. I can go. Thank you. I'm leaving right now. Thank you. Thank you. I'm leaving. I'm leaving. Thank you. Please be seated. Okay, we'll now hear an argument in the last matter on calendar, which is the Carol Campbell Trust. May it please the Court, Mark Ferrario and Kevin DeGraw appearing on behalf of the appellants. Unlike some of the cases that you've heard this morning,
judges: Bright, Dw Nelson, Rymer